# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

H. SCOT LYMAN,
CARDIOSTAT MEDICAL, LLC,

          **Plaintiffs,**

v.                                     **Case No. 05-C-122**

ST. JUDE MEDICAL S.C., INC.,

          **Defendant.**

# DECISION AND ORDER

      The Plaintiffs, H. Scot Lyman ("Lyman") and Cardiostat Medical, LLC, ("Cardiostat") (collectively, "the Plaintiffs"), served and filed a two count complaint against St. Jude Medical S.C., Inc. ("St. Jude"). The first count alleges St. Jude is liable for breach of contract. The second count is a claim for declaratory relief.

      On March 1, 2005, the Plaintiffs filed a motion to disqualify St. Jude's counsel. The Plaintiffs argue that James Gale ("Gale"), Barbara Janaszek ("Janaszek"), and their respective law firms should not be permitted to represent St. Jude in the wrongful termination/breach of contract action because (1) Gale and Janaszek have a prior attorney-client relationship with Lyman, and (2) a "substantial relationship" exists between the present

1

lawsuit and Gale's and Janaszek's prior joint representation of Lyman and St. Jude in previous litigation involving Lyman's former employer.

On March 7, 2005, St. Jude filed a motion to dismiss the Plaintiffs' claim for declaratory relief. The parties have fully briefed the issues presented by these motions, which are now ready for resolution.

## I.     MOTION TO DISMISS

### A.     Background

St. Jude is a Minnesota corporation engaged in the sale of cardiac rhythm management (CRM) devices like cardiac pacemakers, defibrillators and related products. (First Amended Complaint "FAC" ¶¶ 8, 14.) Lyman is a resident of Wisconsin, who for over eighteen years has been selling pacemakers and defibrillators to doctors and hospitals in southeastern Wisconsin. (*Id.* at ¶ 6.) Lyman is employed by Cardiostat, which is a Wisconsin limited liability company with its principal place of business in Mequon, Wisconsin. (*Id.* at ¶ 7.)

In November of 2002, St. Jude entered into a ten-year Agreement (the "Agreement") with Lyman, which permitted Lyman to market, distribute and sell St. Jude's cardiac pacemakers and certain defibrillators to specific physicians and hospitals in southeastern Wisconsin. (*Id.* at ¶ 1.) The following day, on December 2, 2002, the parties amended the Agreement to add Cardiostat as the Representative of the Agreement. (*Id.* at ¶ 1.) The Agreement also included a non-compete provision that prohibited Lyman or Cardiostat from

2

competing with St. Jude for a one-year period following termination of the Agreement. (*Id.* at ¶ 22.)

In September 2004, the relationship between St. Jude and Lyman became strained. Specifically, on September 10, 2004, St. Jude's Regional Sales Director, Fred Hjertstedt ("Hjertstedt") wrote Lyman a letter expressing concern about Lyman's poor sales performance, and indicating that "trust and credibility issues" had arisen between Lyman and physicians at an important St. Jude's account, St. Luke's Medical Center in Milwaukee ("St. Luke's"). (*Id.* at ¶ 28.) Hjertstedt requested that Lyman "no longer call on St. Luke's" and stated that Lyman's "continual refusal to stay out of St. Luke's is a breach of the Representative Agreement." (*Id.*) Hjertstedt gave Lyman thirty days to cure his "breach." (*Id.*)

St. Jude followed with another letter to Lyman in October 2004. (*Id.* at ¶ 29.) Again, St. Jude directed Lyman to refrain from calling on physicians at St. Luke's and advised him that continuing to do so constituted a breach of the Agreement. (*Id.*) Finally, on January 19, 2005, St. Jude wrote Lyman a letter terminating the Agreement. (*Id.* at ¶ 30.)

As a result, Lyman filed a complaint against St. Jude in the Circuit Court of Ozaukee County, Wisconsin. Lyman set forth a single count alleging that St. Jude is liable for breach of contract by wrongfully terminating the Agreement. The case was removed to this Court, and on February 18, 2005, Lyman submitted an amended complaint. In the amended complaint, Lyman added Cardiostat as a co-plaintiff, and also, for the first time, sought

declaratory judgment as to the "validity, legality, enforceability and/or applicability" of the non-compete provision of the Agreement.  (*Id.* at ¶ 42.)  Specifically, Lyman and Cardiostat allege that § 103.465, Wis. Stat., makes the non-compete provision invalid and unenforceable.  (*Id.* at ¶¶ 45-46.)

St. Jude filed a motion to dismiss the declaratory judgment claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  St. Jude argues that this Court lacks subject matter jurisdiction to adjudicate the declaratory judgment claim because the claim does not raise a judicable case or controversy.

## B.    Analysis

Article III of the United States Constitution conveys federal courts' jurisdiction over "cases" and "controversies."  U.S. Const., Art. III, § 2.  "This requirement applies with the same force to actions for declaratory judgments . . . ."  *Vickers v. Henry County Sav. & Loan Ass'n*, 827 F.2d 228, 230 (7th Cir. 1987).  A judicable claim for declaratory relief is one where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Alcon Aluminum Ltd. v. Dep't of Revenue*, 724 F.2d 1294, 1298 (7th Cir. 1984) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  The judicable controversy must have existed at the time the complaint was filed.  *See Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748, 752 (7th Cir. 1976).

4

While the Seventh Circuit has not addressed whether a claim for declaratory relief is judicable in the context of non-compete provisions, a Seventh Circuit case addressing whether an actual controversy existed in the patent infringement context is instructive.[1]  In *International Harvester Company v. Deere & Company*, 623 F.2d 1207 (7th Cir. 1980), the plaintiff filed a suit seeking a declaratory judgment that its product did not infringe the defendant's patent.  *Id.* at 1210.  The plaintiff's complaint in *International Harvester* did not allege that the defendant threatened a patent infringement suit, or that the defendant even accused the plaintiff of patent infringement.  Nor did the plaintiff allege, in any detail, the preparations it was making to produce its product.  As a result, the Seventh Circuit held that the plaintiff's claim for declaratory relief was not a judicable controversy.  *Id.* at 1217.  The court reasoned that the defendant's conduct did not create a "reasonable apprehension" on the plaintiff's part that it would face a patent infringement suit, nor had the plaintiff "engaged in preparations" for production of the product at issue.  *Id.* at 1210.

While *International Harvester* was a case in the patent infringement context, two principles can be gleaned that are applicable here.  First, Lyman and Cardiostat must have a "reasonable apprehension" that St. Jude was going to file a suit against them for violating the non-compete provision.  And second, Lyman and Cardiostat must allege that they were

---

[1] While a breach of a non-compete provision arises out of a contract, and while a patent infringement suit is statutory in nature, the conduct that creates a controversy for purposes of declaratory relief is similar in both instances. *See Bruhn v. STP Corp.*, 312 F. Supp. 903, 906 n.1 (D. Colo. 1970).

5

preparing to engage in conduct that would compete with St. Jude. Lyman and Cardiostat allege neither in their complaint.

Another case that the Court finds persuasive is *Bruhn v. STP Corporation*, 312 F. Supp. 903 (D. Colo. 1970). In *Bruhn*, eleven employees sought a declaratory judgment that non-competition clauses in their employment contracts were invalid. In their complaint, the employees alleged that they "desire[d] and intend[ed]" to compete with their employer. *Id.* at 905. Furthermore, the employees' complaint alleged that when they requested that their employer release them from the non-compete provision, their employer refused. *Id.* Nonetheless, the court held that these allegations were not ripe enough to create a case or controversy, and dismissed the action. *Id.* at 907.

According to the court in *Bruhn*, a case or controversy is only ripe "where the danger or dilemma of the plaintiff is present and not contingent on the happening of hypothetical future events." *Id.* at 905. In order to better illustrate when that occurs, the court explained that claims for declaratory relief are ripe for adjudication in two different circumstances. *Id.* at 905-06. One scenario would be where the plaintiff has already violated the non-compete provision. In such a case, a declaratory judgment claim would be ripe for adjudication because otherwise the plaintiff would have to wait until the adverse party brought suit in order to determine the propriety of his conduct. *Id.* Also, according to the court in *Bruhn*, an actual controversy exists when "one or both parties have . . . pursued a course of conduct which will result in 'imminent' and 'inevitable' litigation." *Id.* at 906.

6

The question for the court in *Bruhn*, therefore, was whether the eleven employees or their employer had begun a course of conduct that made litigation "imminent" or "inevitable." The court determined that litigation was not "imminent" or "inevitable" because the plaintiffs did not allege that they had begun preparations to distribute products competitive to their employer, nor did they allege that the defendants threatened suit or that the defendant had even claimed that the plaintiffs breached the non-compete provision. *Id.* at 906-07.

The instant case has facts similar to those in *Bruhn*. Like the plaintiffs in *Bruhn*, Lyman and Cardiostat never claimed that they were taking any steps to compete with St. Jude. Also, like the plaintiffs in *Bruhn*, Lyman and Cardiostat never alleged that St. Jude threatened suit, or even that St. Jude ever claimed that they breached the non-compete provision. Indeed, Lyman and Cardiostat pled even less of a conflict than the plaintiffs in *Bruhn*. Unlike Lyman and Cardiostat, the plaintiffs in *Bruhn* alleged that they "desire[d]" and "intend[ed]" to compete with their former employer, and unlike Lyman and Cardiostat, they further alleged that the defendant refused to release them from the non-compete provision. *Id.* at 905. It appears, therefore, that Lyman and Cardiostat's claim for declaratory relief is not ripe for adjudication.

Nevertheless, Lyman and Cardiostat argue that because the first count in their complaint, the breach of contract claim, provides an independent basis for jurisdiction, then the Court is free to also decide their declaratory judgment claim. They cite a Ninth Circuit

7

case, *Snodgrass v. Provident Life & Accident Insurance Company*, 147 F.3d 1163 (9th Cir. 1998), to support their argument.

*Snodgrass* is inapposite. It involved an insurance dispute originally brought in state court. The insured sued for breach of contract, violation of state insurance laws, and intentional and negligent infliction of emotional distress. The insured also brought a claim for declaratory relief. The insurer removed the case to federal court on the basis of diversity jurisdiction.

The district court in *Snodgrass* invoked the discretionary jurisdiction rule of the Declaratory Judgment Act to remand the entire case back to state court.[2] The Ninth Circuit reversed, because the discretion afforded by the Declaratory Judgment Act does not extend to other claims that fall within the district court's jurisdiction. *Id.* at 1167. That is, the district court's discretion to decline jurisdiction under the Declaratory Judgment Act could not be used to decline jurisdiction over claims that were properly before the court on the basis of diversity jurisdiction. *Id.*

Lyman and Cardiostat, therefore, cannot use *Snodgrass* for the proposition that their breach of contract claim somehow automatically confers jurisdiction over their declaratory judgment claim. *Snodgrass* did not address that question. Indeed, courts have dismissed declaratory judgment claims that do not present an actual controversy, while simultaneously exercising jurisdiction over other claims. *See, e.g., Planet Hollywood (Region IV), Inc. v.*

---

[2] Under the Declaration Judgment Act, a district court may decline to exercise jurisdiction over a declaratory action even though subject matter jurisdiction is otherwise proper. *See* 28 U.S.C. 2201(a).

8

*Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 872 (N.D. Ill. 1999) (dismissing declaratory judgment claims for not presenting an "actual controversy," while also exercising jurisdiction over claims arising under the Lanham Act and Illinois state law).

Accordingly, Count II of Lyman's and Cardiostat's complaint is dismissed.

## II.    MOTION TO DISQUALIFY

The Court recognizes that disqualification is a drastic remedy, but doubts regarding the existence of a conflict of interests should be resolved in favor of disqualification. *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (7th Cir. 1978). For a court to grant a motion to disqualify counsel, a prior attorney-client relationship must exist between the moving party and the attorney(s) that party seeks to disqualify. *Nelson v. Green Builders, Inc.*, 823 F. Supp. 1439, 1444 (E.D. Wis. 1993) (citing *Westinghouse Elec. Corp.*, 580 F.2d 1311). There is no dispute that Gale and Janaszek did, in fact, represent Lyman, along with St. Jude, in a 2002 action against Lyman's former employer, Guidant.

The Plaintiffs argue that, once a prior attorney-client relationship is established, disqualification of counsel is appropriate if a substantial relationship exists between the matter in which the attorney(s) had previously represented the moving party and the matter currently pending. *See Berg v. Marine Trust Co.*, 416 N.W.2d 643, 647 (Wis. Ct. App. 1987). The Plaintiffs assert that the Court should apply the Wisconsin "substantial relationship" test, under which a substantial relationship will be found if "the factual contexts

9

of the two representations are similar or related." *Id*. The Plaintiffs further point out that, in determining whether a substantial relationship exists, "doubts as to the existence of an asserted conflict should be resolved in favor of disqualification." *See Westinghouse Elec. Corp.*, 588 F.2d at 225.

At first glance, the case law in this circuit seems inconsistent, sometimes asserting that state ethical rules govern questions of disqualification and, at other times, only invoking federal law. *See Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) (discussing an attorney violation of a Wisconsin Supreme Court Rule); *Callas v. Pappas*, 907 F. Supp. 1257, 1258 (E.D. Wis. 1995); *but see Powell v. Adams*, 763 F. Supp. 406, 407 (E.D. Wis. 1991) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982)) ("Although the briefs of both sides place major reliance upon the Rules of the Supreme Court of Wisconsin, this court is obligated to decide the legal questions posed by the instant motion under *federal* law.). In fact, both Wisconsin state courts and the Seventh Circuit utilize the "substantial relationship test" when considering questions of disqualification. *See Berg*, 416 N.W.2d at 646-47 (Wis. Ct. App. 1987).

The Seventh Circuit has explained that "the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." *Westinghouse Elec. Corp.*, 588 F.2d at 224. The substantial relationship test "involves a realistic appraisal of the possibility that confidences

10

had been disclosed in the one matter which will be harmful to the client in the other." *Id.*
The test "is not a rule of substantive law but a measure of the quantum of evidence required
for proof of the existence of the professional obligation." *Id.*

In *LaSalle Bank*, the Seventh Circuit identified the "three-level inquiry" that must be
undertaken "in order to determine if . . . a substantial relationship exists":

> First, the trial judge must make a factual reconstruction of the scope of the
> prior legal representation. Second, it must be determined whether it is
> reasonable to infer that confidential information allegedly given would have
> been given to a lawyer representing a client in those matters. Third, it must be
> determined whether that information is relevant to the issues raised in the
> litigation pending against the former client.

*LaSalle Nat'l Bank*, 703 F.2d at 255-56 (citing *Westinghouse Elec. Corp.*, 588 F.2d at 225);
*Novo Terapeutisk Laboratorium v. Baxter Travenol Labs., Inc.*, 607 F.2d 186, 195 (7th Cir.
1979)). If a party satisfies this three-part test, the Court will assume that the attorney
received confidential information as counsel in the previous litigation. *Id.*

A.      Scope of the Prior Litigation

From 1984 up until November of 2002, Lyman worked for Guidant Corp., Cardiac
Pacemakers, Inc., and Guidant Sales Corporation, selling cardiac rhythm management
("CRM") devices. (Def.'s Mem. in Opp'n to Mot. to Disqualify ["Opp'n Mem."] at 2.) In
2002, Lyman sought to become an independent sales representative of St. Jude. (*Id.*)
Ultimately, St. Jude and Lyman did execute a Representative Agreement (the "Agreement"),
by which he was allotted a certain geographical region in Wisconsin for selling and

11

marketing cardiac rhythm management products. A subsequent amendment to the Agreement altered the accounts that fell within this assigned territory.

The Agreement identifies both hospital and individual physician accounts to whom Lyman could market CRM devices.[3] Similar to the agreement with his prior employers, Lyman's agreement with St. Jude contains various post-termination restrictions on competition. During his negotiations with St. Jude, Lyman was represented by David Halling of Halling & Cayo, S.C. Current counsel for St. Jude in the present action played no role in Lyman's employment negotiations related to his Agreement with St. Jude. Nor did St. Jude's current counsel play any role in drafting any documents related thereto.

In November 2002, James Gale was retained by St. Jude to represent Lyman individually in matters related to Lyman's resignation from Guidant Sales Corporation (GSC) and any complications arising from his non-compete agreement with GSC. Gale provided advice regarding how Lyman could terminate his relationship with GSC. Also in 2002, Lyman and St. Jude, adversaries in the instant action, were plaintiffs in a Wisconsin state lawsuit filed against Lyman's former employers, Guidant Corp., Cardiac Pacemakers, Inc., and Guidant Sales Corporation. The scope of the 2002 litigation, in which the Plaintiffs were represented by St. Jude's current counsel, included a request for declaratory relief on the issue of whether a non-compete clause in Lyman's Guidant employment contract was

---

[3] The parties disagree whether Lyman's agreement with his former employers and his subsequent agreement with St. Jude cover the same geographic regions. (*See* Pl.'s Mot. to Disqualify Counsel for St. Jude Medical S.C., Inc. at 7; Opp'n Mem. at 4.)

12

overbroad and therefore unenforceable. That action also included a request for injunctive relief to keep GSC from enforcing the non-competition agreement. GSC filed a counterclaim and cross-motion for an injunction enforcing the non-compete agreement. The litigation against Lyman's former employers was ultimately settled and the action dismissed.

Things did not work out between Lyman and St. Jude. As recounted in the first part of this decision, in September of 2004, St. Jude sent a letter to Lyman stating that his sales data were a cause for concern. Also, St. Jude stated that it had been made aware of trust and credibility issues between Lyman and his customers. St. Jude, at that point, restricted Lyman from working at St. Luke's Medical Center in Milwaukee. St. Jude's and Lyman's relationship ended in January of 2005 when St. Jude informed Lyman that it was terminating his Agreement. St. Jude, in its termination letter dated January 19, 2005, explained that Lyman's clients refused to work with him and Lyman's efforts were tarnishing St. Jude's reputation.

Less than two years after being co-plaintiffs in state court, St. Jude and Lyman are adversaries before this Court. Lyman alleges damages resulting from St. Jude's breach of the Agreement and, further, seeks a declaratory judgment invalidating the post-termination restrictions imposed by that same Agreement. St. Jude, for its part, alleges that Lyman's performance became unsatisfactory due to poor sales and credibility issues. These concerns were expressed in an August 31, 2004 written notice, in which St. Jude told Lyman to stop visiting his physician clients. This notice also provided Lyman with a cure period.

Subsequently, communications were exchanged between St. Jude and Lyman's attorney, Halling. St. Jude believes that Lyman's performance did not improve and, accordingly, sent him a written termination on July 19, 2005. At the end of January, Lyman filed suit against St. Jude, claiming that it had wrongfully terminated the Agreement. An amended complaint added allegations related to the non-compete provision of the Agreement.

B.   Confidential Information

Under the second prong of the substantial relationship test, the Court must determine "whether it is reasonable to infer that confidential information allegedly given would have been given to a lawyer representing a client in those matters." *LaSalle Nat'l Bank*, 703 F.2d at 255-56. "The substantial relationship standard does not require that a party moving to disqualify point to or reveal a particular piece of confidential information which the attorney challenged actually received; its receipt will be presumed in circumstances which make it a likely possibility." *Id.*

The Plaintiffs allege that, during the 2002 litigation, they disclosed information to St. Jude's counsel regarding Lyman's previous employment, the products he sold, the geographic regions in which he sold them, and the doctors who were his customers. St. Jude does not contest that the Plaintiffs disclosed this information. St. Jude, based on its opposition brief, thinks that it can short circuit the analysis by showing that none of the information actually provided by Lyman during the previous litigation was confidential.

14

Accordingly, St. Jude argues that Lyman's so-called confidential information was common knowledge–hence, not really confidential– and that common knowledge was shared with a third party, Lyman's then-co-plaintiff St. Jude.

The Court is not certain that either party has fully explored this prong of the substantial relationship test. The Court agrees with the Plaintiffs' proposition that St. Jude cannot circumvent the substantial relationship test by showing that disclosed information was not confidential. Still, contrary to certain of the Plaintiffs' representations, the presumption of confidentiality follows *once the substantial relationship test has been satisfied*. Once the Court finds the existence of a substantial relationship, there is a presumption that confidential information was exchanged. *See Analytica*, 708 F.2d at 1267 (stating that it is irrelevant whether a lawyer actually obtained confidential information and used it against his former client). This understanding is consistent with the Seventh Circuit's explanation that "the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 722 n.10 (7th Cir. 1982).

The salient question is whether it is reasonable to infer that the type of confidential information allegedly given would, in fact, have been given as part of that attorney-client relationship. While this may not be a question that depends on whether confidential information was actually exchanged, it does depend on the arguments of the party seeking

15

disqualification to explain why the prior litigation, or similar types of litigations, likely involve the exchange of certain confidential information. If the movant did not have to discharge this burden, the existence of a prior attorney-client relationship would be *per se* proof of an exchange of confidential relationship.

The Plaintiffs spend a portion of their reply brief explaining why their declaratory claim before this Court is related to Lyman's prior representation. Obviously, when the motion to disqualify was briefed, the parties did not anticipate the Court's dismissal of the Plaintiffs' count for declaratory relief. At any rate, the Court focuses solely on the breach of contract count currently pending before it. Before proceeding, the Court notes a certain overlap between the parties' arguments related to the possible exchange of confidential information and the relationship between the prior and present litigations. Thus, the analysis of the second and third prongs of the substantial relationship test is informed by similar arguments in this case.

In their reply brief, the Plaintiffs argue that Lyman disclosed all aspects of:

(a) Lyman's employment with Guidant, (b) the types of CRM products Lyman marketed and sold for Guidant, (c) the precise southeastern Wisconsin territories Lyman was assigned to represent on behalf of Guidant, (d) the individual implanting cardiologists and surgeons Lyman called on and/or sold in southeastern Wisconsin on behalf of Guidant, and (e) the individual implanting cardiologists and surgeons Lyman did not call on or sell in southeastern Wisconsin on behalf of Guidant.

(Reply Br. 13.) This same information, the Plaintiffs continue, is "highly relevant" to the Plaintiffs' breach of contract claim because St. Jude claims that Lyman did not fulfill the

16

obligations found in the Agreement and that he even made material misrepresentations when negotiating that agreement. The Plaintiffs' argument, in light of the Court's ruling on the motion to dismiss, amounts to the claim that, while the causes of actions between the prior and current litigations may differ, the factual circumstances bear striking similarities.

St. Jude retorts that Lyman's admitted disclosures during the prior litigation have no bearing on the present action:

> A more measured conclusion would simply be that, appropriately in a lawsuit involving Mr. Lyman's prior relationship with Guidant, Mr. Lyman disclosed information relevant to his relationship with Guidant. But clearly, Mr. Lyman's "employment with CPI and GSC," the types of products he "marketed and sold for CPI and GSC," and the identity of the implanting surgeons and cardiologists upon whom he called or did not call "on behalf of CPI and GSC" have nothing to do with his current dispute with St. Jude.

(Opp'n Mem. 9.) (The quotes cited by St. Jude in the above excerpt are taken from Lyman's affidavit in support of his motion to disqualify.) St. Jude argues that, in the prior litigation, Lyman did not discuss anything with St. Jude's counsel that could have any bearing on the present action. All of the previously disclosed information concerned Lyman's relationship with Guidant, not St. Jude. Secondarily, St. Jude argues that the information conveyed was not relevant to the instant action and was not even confidential insofar as the information was disclosed to St. Jude. Additionally, St. Jude argues that the matters disclosed were within the realm of public common knowledge.

The Court finds that the type of information Lyman claims to have exchanged with counsel in his prior litigation is the type of information one would expect a client to convey

17

to his attorney when litigating issues related to employment and the enforceability of a non-compete clause. St. Jude does not contest this point, though the parties do dispute the relevance of the term "confidential" in the second prong of the "substantial relationship" test. St. Jude assumes that confidentiality should be understood in an evidentiary sense, whereas the Plaintiffs think St. Jude's interpretation of "confidential" belies an understanding of an attorney's ethical obligations. The Court is persuaded by the Plaintiffs' reasoning.

The Plaintiffs correctly state that, even if Lyman and St. Jude were jointly represented in the prior litigation, the ethical privilege of confidentiality still applies. In other words, even if Lyman waived the evidentiary attorney-client privilege, Gale and Janaszek are still bound by the ethical privilege of confidentiality. *See, e.g.*, *McClure v. Thompson*, 323 F.3d 1233, 1242 (9th Cir. 2003) (discussing the duty of confidentiality under the ABA Model Rules and the limited exceptions to that rule).[4] "Confidential" information, for purposes of the ethical privilege, means "information relating to the representation of a client" that cannot be disclosed by an attorney except in carefully circumscribed situations.[5] This understanding is found both in the ABA's Model Rules and the Wisconsin Supreme Court Rules. *See* Model Rules of Prof'l Conduct R. 1.6 (2003); Wis. S.C.R. 20:1.6 cmt (2003) ("The

---

[4]The comment to ABA Model Rule 1.6 states that "[t]he confidentiality rule . . . applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Model Rules of Prof'l Conduct R. 1.3 cmt. (2006).

[5]Even if the Court accepted St. Jude's explanation of what should be deemed confidential, the Court could still reasonably presume that Lyman set forth all the particulars of his business strategies and dealings, to his then-counsel, when litigation was pending against his former employer. Surely such information, under any standard, would qualify as "confidential."

18

confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.").[6]

The Court finds that it is likely that Lyman shared confidential information, related to his employment, customers, and services, with his former counsel (now St. Jude's current counsel) during the prior litigation.

C.    Relevance of Previously Disclosed Information to Current Litigation

Under the third prong of the substantial relationship test, the Court must determine whether the confidential information given in the prior action is relevant to the issues raised in the litigation pending against the former client. *LaSalle Nat'l Bank*, 703 F.2d at 255-56 (citing *Westinghouse Elec. Corp.*, 588 F.2d at 225).[7]  St. Jude argues that it is less than clear how the information that the Plaintiffs disclosed to St. Jude's counsel during the 2002 litigation is relevant to either the Plaintiffs' claim of wrongful termination or their request for declaratory judgment.  (It should be borne in mind that the parties' arguments were

---

[6]Perhaps St. Jude might argue that applying the ethical understanding of confidentiality eviscerates the second prong of the substantial relationship test because most, if not all, communications between clients and their attorneys fall within the purview of an attorney's ethical obligation to maintain confidentiality.  Why, St. Jude might ask, would there even be a second prong to the substantial relationship test if most information exchanged between the client and attorney is confidential?

Certainly, information must be "confidential" to come within the second prong of the test.  However, the second prong also requires the Court to inquire whether it is reasonable to infer that such confidential information would have been exchanged in the type of case forming the prior litigation.  The second prong leads to the analysis of the final part of the substantial relationship test.  If it is not likely that such information was exchanged in the prior litigation, there is no need for the Court to proceed further.  If the Court finds that it is reasonable to infer that certain information passed between the client and attorney in the prior litigation, the Court must then inquire into the relationship between that information and the present action.

[7]Lyman is correct when he asserts that the test does not care whether such information was actually obtained by an attorney and used against a former client.  The question is whether "the lawyer *could* have obtained confidential information in the first representation that *would have been* relevant in the second."  *Analytica, Inc.*, 708 F.2d at 1266 (emphasis added).

proffered before the Court resolved St. Jude's motion to dismiss the Plaintiffs' count for declaratory judgment.) The Plaintiffs respond that the information bears directly on St. Jude's fifth affirmative defense, which states that "Plaintiff Lyman made material misrepresentations to Defendant [St. Jude] when he negotiated the terms of the sales Representative Agreement regarding his relationship with the physicians and hospital staff, and the volume of business in the territory." (Reply Br. 14.) The Plaintiffs state that the products Lyman sold, as well as to whom and where he sold them, "did not substantially change in any respect in the last year of his representation of Guidant and the past two years with St. Jude." (Reply Br. 14.)[8]

If, as the Plaintiffs contend, Lyman performed essentially the same sales services for Guidant as he does for St. Jude, then St. Jude (and its counsel) must be aware of the scope of Lyman's previous employment, the products he sold, the geographic regions in which he operated, and the identities of his clients. It is even reasonable to assume that, as a result of the prior litigation, St. Jude's counsel was privy to, and received, information about how Lyman conducted his business. And, one of St. Jude's affirmative defenses suggests that Lyman materially misrepresented some aspects of his business, including his relationships with physicians and hospital staff, as well as his volume of business. If Lyman–following St. Jude's train of thought–misrepresented his business when he signed with St. Jude, those

---

[8]The Plaintiffs' arguments on this point comprise a mere two pages of the briefing, found in the reply brief. (*See* Reply 13-14.)

misrepresentations must involve his work with Guidant. And, St. Jude's current counsel likely received confidential information related to Lyman's employment with Guidant. Thus, St. Jude's own pleading suggests a relationship between the former and present actions.

Even apart from the implications of its affirmative defenses, it is clear that Gale and Janaszek represented Lyman in an action involving much of the same factual information relevant to the instant litigation. The differences in the claims involved in those actions have little bearing on the Court's analysis. An attorney is not loosed from his ethical obligations and free to share information conveyed in confidence by a former client simply because the causes of action in prior and subsequent litigations are not congruous. The same confidential information that was relevant in the action against Lyman's former employer has bearing on the resolution of the suit before this Court.[9]

St. Jude thinks it is relevant that Lyman was represented by another attorney (Halling) when negotiating his agreement with St. Jude. This observation, however, does not address the likelihood that the information conveyed from Lyman to St. Jude's counsel in the Guidant-related action may be relevant in the present litigation. Whether Lyman had

---

[9]The parties spend a fair amount of their briefing space arguing over the similarities of the two actions. It is true, as St. Jude points out, that Lyman's supporting memorandum seems to rely, almost exclusively, on the relationship between the prior litigation and the current request for declaratory judgment. (*See* Opp'n Mem. 23; Supp. Mem. 7.) Nevertheless, Lyman did argue that the information from the prior litigation would "play a substantial role in both the breach of contract and declaratory judgment claims in the present lawsuit." (Supp. Mem. 9.) This argument is given slightly more treatment in the Plaintiffs' reply. At any rate, the Court does not accept St. Jude's characterization that "the entire basis for Plaintiffs' motion to disqualify is a purported 'substantial relationship' between Plaintiffs' newly added Count II – a claim for declaratory relief regarding the non-compete provisions of the Representative Agreement – and the Prior Representation regarding the validity of the Guidant non-compete agreement." (Opp'n Mem. 23.)

separate counsel when negotiating his Agreement with St. Jude is not germane to the Court's disqualification analysis.

The Court finds that there is a substantial relationship between the prior litigation in which St. Jude and Lyman were co-parties, and the present litigation. Therefore, the motion to disqualify is granted.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

St. Jude's Motion to Dismiss (Docket No. 32) is **GRANTED**.

The Plaintiffs' Motion to Disqualify for St. Jude Medical S.C., Inc. (Docket No. 27) is **GRANTED**.

Dated at Milwaukee, Wisconsin this 29th day of March, 2005.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**

22