# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

H. SCOTT LYMAN, an individual,
CARDIOSTAT MEDICAL LLC,
a Wisconsin Limited Liability Company,

                Plaintiffs,

                                      Case No. 05-C-122

        -vs-

ST. JUDE MEDICAL S.C., INC.,
a Minnesota Corporation,

                Defendant.

---

# DECISION AND ORDER

---

      This case is set for a jury trial to commence the week of June 2, 2008. In December 2002, the plaintiffs, H. Scott Lyman ("Lyman") and CardioStat Medical LLC ("CardioStat"), entered into a ten-year Representative Agreement with the defendant, St. Jude Medical S.C., Inc. ("St. Jude"), to sell and support cardiac rhythm management ("CRM") products in Southeast Wisconsin. In 2004, St. Jude terminated the Agreement just two years into the contract.

      Now before the Court are numerous motions *in limine*, which are set forth and discussed separately below.[1]

---

[1] St. Jude requests oral argument on its motions *in limine*. The Court finds that oral argument is unnecessary. *See* Civil L.R. 7.1(e).

## I.    Expert testimony

Both parties retained experts in the field of accounting to assist with the calculation of damages in the instant case.  Both parties now move to exclude the opposing party's expert.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, as revised in response to *Daubert v. Merrell Dow Pharamaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  Rule 702 provides that if

> scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the
> form of an opinion or otherwise...

The inquiry breaks down into three general areas: (1) the testimony must be "helpful," which dovetails with the relevance requirements of Fed. R. Evid. 401-403; (2) the expert must be qualified by knowledge, skill, experience, training or education; and (3) the testimony must be reliable and fit the facts of the case.

Under the third part of the analysis, the Court examines whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  The Court acts as a "gatekeeper for expert testimony, only admitting such testimony after receiving satisfactory evidence of reliability."  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001).  To help ensure the reliability of expert testimony, the Court considers, for example, whether the theory can be and has been

-2-

verified by the scientific method through testing, whether the theory has been subjected to peer review, the known or potential rate of error, and the general acceptance of the theory in the scientific community. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996).

Finally, despite the Court's role as a gatekeeper, expert testimony is liberally admissible under the Federal Rules of Evidence. *See, e.g., Canino v. H.R.P., Inc.*, 105 F. Supp. 2d 21, 28 (S.D.N.Y. 2000)(in view of liberal thrust of FRE and presumption of admissibility of expert testimony, doubts about usefulness of expert testimony should be resolved in favor of admissibility). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

### A.    Background

In this case, the parties' experts should assist the jury in making the following determination: *assuming an improper termination of the Representative Agreement by St. Jude, based on the evidence adduced at trial pertaining to the probable amount and trend of Plaintiffs' sale of St. Jude's CRM products through the duration of the Agreement, what are Plaintiffs' present-value, mitigated damages caused by St. Jude's breach of contract?*

Plaintiffs' ten-year contract with St. Jude provided for an initial 4-year guarantee period. CardioStat[2] was to receive $775,000 for the first year, $750,000 for the second and third years, and $725,000 for the fourth year, for a cumulative total of $3,000,000. This portion of the damages calculation is not in dispute.

---

[2] Lyman is the sole owner and employee of CardioStat.

After the 4-year guarantee period (*i.e.,* for the final six years), the contract provided that CardioStat would be paid strictly on commissions from its sales of St. Jude CRM products: 17% commission for a cardiac pacemaker, and 7% for a defibrillator.

The parties also executed a Separate Letter Agreement ("SLA") in October 2002. The SLA gave CardioStat a "put" option, to wit: "the sole and exclusive right, irrevocable within the time period provided for exercise" to require St. Jude to purchase CardioStat's "business." The sale price would equal twenty percent of the net sales generated in CardioStat's contractually defined territories for the 12-month period immediately preceding the date the option was exercised.

CardioStat was an independent sales representative business, so it was not responsible for any of the costs related to producing, marketing or handling the CRM products until the point they were ready to be sold and used. CardioStat's costs were therefore relatively fixed over time, even if sales were projected to increase. The contract provided that CardioStat was responsible for automobile expenses directly related to his sales activities and for Lyman's paging service.

Finally, Lyman's income with his current employer, Articure, must also be accounted for purposes of mitigation.

## B. St. Jude's motion: Daniel Gotter

St. Jude moves to exclude plaintiffs' expert witness, Daniel Gotter ("Gotter"). Gotter is a Certified Public Accountant (CPA), a Certified Valuation Analyst (CVA), and an Accredited Business Valuator (ABV). Gotter is a shareholder with the accounting firm of

-4-

Winter, Kloman, Moter & Repp, S.C.. Gotter specializes in litigation support, accounting and tax services directed toward closely-held business, business valuations, business succession, and estate planning. He holds a Bachelor of Business Administration (in accounting) from the University of Wisconsin-Milwaukee. Gotter has testified as an expert in numerous federal and state court civil cases across the state of Wisconsin.

Gotter provides five different models to assist the jury in its damages projections. Plaintiffs argue that each damage scenario is supportable and reasonable based upon the evidence that Gotter reviewed as the basis for his opinions, and which will be presented at trial for consideration by the jury. St. Jude objects generally to this "leave it to the jury" approach. But there is nothing which *requires* an expert to opine conclusively on an ultimate issue. Rather, the province of an expert is to provide testimony that will assist the trier of fact. There is no question that Gotter's testimony will assist the jury in its calculation of damages, should that prove to be necessary.

St. Jude also takes issue with each individual projection model:

**Model A** is based on minimum sales quotas, which come from the contract documents themselves. St. Jude argues that it is improper to use sales quotas to project future sales because Gotter is using his own "untestable logic" to assume that there is a logical relationship between quotas and sales. However, like the mutually-agreed upon expectations for performance, the assumption that sales would track quotas is not an illogical assumption. St. Jude cites *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005), which excluded an expert opinion as to the projected sales of satellite TV boxes in a

newly-forming marketplace. The expert in *Zenith Electronics* was properly excluded because he provided nothing but a "bottom line" based on his self-proclaimed expertise. In this case, Gotter thoroughly analyzed Lyman's contractually-assigned sales territory, which was anything but newly-forming or hypothetical. Lyman's territory with St. Jude was the same territory in which he sold CRM products for 18 years prior to joining St. Jude.

**Model B** is based on the projections drafted by John C. Heinmiller ("Heinmiller") during St. Jude's recruitment of Lyman. Heinmiller is the Chief Financial Officer of St. Jude's parent company. St. Jude argues that Gotter cannot be allowed to "blindly accept" projections of future sales. Again, the Heinmiller memo, just like the minimum sales quotas in the contract, reflect the mutually agreed-upon expectations of the parties with respect to future sales. St. Jude cites *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998), which rejected internal sales projections as the basis for the expert's projections. Once again, *Target Market* is distinguishable, as the assumptions underlying those projections were deemed unreasonable, largely because they relied upon penetration into newly-forming marketplaces. 136 F.3d at 1144. *Target Market* is also distinguishable because CardioStat exceeded its contractual quotas during its initial performance under the contract, whereas the joint venture in *Target Market* was floundering. In short, *Target Market* does not create a *per se* rule against the use of internal sales projections.

**Model C** is a regression analysis based on CardioStat's past sales at St. Jude, valuing a sale on the implant date (as opposed to the sale date). St. Jude takes issue with the use of implant date because the contract provides that plaintiffs are compensated according to sales

-6-

date.  St. Jude accuses Gotter of manipulating the data to avoid the impact of "bulk sales."

The use of implant date as opposed to sales date is a reasonable method to project future

sales because it more accurately accounts for the efforts of the salesperson.  Bulk sales, on

the other hand, are made at the corporate level with minimal involvement from the

salesperson.  The use of implant date is not so unreasonable that it renders Gotter's opinions

unreliable.

St. Jude also argues that Gotter's regression model is unreliable because the R-squared

value from the regression explains only 15.4% of the increase in sales volume.  However, use

of the "t-statistic" is a better measure than $R^2$ to determine the reliability of a regression

model.  (D. 131, Decl. of Kenneth West).  In this case, the t-statistic measurement

demonstrates that Gotter's regression model is statistically significant.  *Id.*  Therefore, the

Court finds that Gotter's regression model is a potentially reliable measure of damages in the

instant case.[3]

**Model D** projects future sales by multiplying the projected sales revenues from Model

A by a factor of 1.65.  This model is based on two assumptions: (1) Cardiostat's sales quotas

for years 5 through 10 would continue their historical increase of $1 million per year as in

Model A; and (2) Cardiostat would outpace those projected quotas by 165%, as it did in Year

2 for St. Jude.  **Model E** is based on the language in the SLA projecting the possibility that

---

[3]  St. Jude objects to the Declaration of Kenneth West because he was not previously disclosed as an expert witness in this case.  (D. 169, 170).  Dr. West's testimony only became relevant in response to St. Jude's *Daubert* challenge, so there was no requirement of prior disclosure.  The use of supplemental evidence to defeat St. Jude's *Daubert* challenge is proper, and the Court will not strike the Declaration.  *See, e.g., Nightlight Sys. Ins. v. Nitelites Franchise Sys., Inc.*, 2007 WL 4563875 at *8-9 (N.D. Ga.).

CardioStat's net sales for a 12-month period ending on November 1, 2007 would be $8,000,000. None of the assumptions underlying these models are inherently unreliable. The testimony and facts presented at trial will dictate whether damages will be calculated pursuant to either model. Gotter's models assist the jury by performing the calculations.

Finally, St. Jude argues that Gotter's accounting of expenses was erroneous because he failed to account for an increase in costs along with an increase in sales. As noted above, plaintiffs' costs in this case were fixed, and they would not be expected to increase in step with an increase in sales. St. Jude also takes issue with the accounting of mitigation, arguing that Gotter failed to apply the same principles to replacement income as to projected income. Gotter had a defensible basis for the differential treatment. These matters, like many of the criticisms lodged against Gotter's expert opinions, are best saved for cross examination at trial.

For all of the foregoing reasons, St. Jude's motion to exclude Gotter's testimony and report is denied.

### C. Plaintiffs' motion: Randall D. Wilson

Plaintiffs move to exclude St. Jude's expert witness, Randall D. Wilson ("Wilson"). Wilson is a certified public accountant for SMART Business Advisory and Consulting LLC. Mr. Wilson received his Bachelor of Science degree in accounting from Indiana University. Mr. Wilson also received a law degree from Chicago-Kent College of Law. He has 17 years experience in public accounting and consulting services. The focus of Mr. Wilson's career has been on forensic accounting and fraud investigations.

Wilson provides two projections: one weighted, and one unweighted. His projections are derived from Plaintiffs' alleged sales during the time they sold St. Jude CRM products. Wilson's original regression resulted in a negative sloping trendline because CardioStat's sales performance decreased from 2003 to 2004. Recognizing that CardioStat's sales data fluctuated immensely from month to month, Wilson weighted the sales data to obtain a positive sloping trendline for years five through ten of the Representative Agreement. Wilson concluded that Plaintiffs' potential damages were $1,880,630, including $256,435 in lost future commissions and $528,480 for the lost put option. Wilson also provides criticisms of the conclusions and methodologies of plaintiffs' expert witness, Daniel Gotter.

The basis for Wilson's projections is Deposition Exhibit 272, which purports to be a summary of Plaintiff's CRM sales data during Plaintiffs' tenure at St. Jude. This document was produced by St. Jude during the course of discovery, but Wilson did not independently verify the source and accuracy of the data. Wilson did cross-check the information against other documents, but the bottom line is that Wilson never talked to anyone at St. Jude to verify the accuracy of the information in any of the documents he reviewed. Wilson's information was received solely from St. Jude's counsel.

Further undercutting the reliability of Wilson's opinions and projections is the fact that Wilson never talked to a single St. Jude employee about the facts of this case. As a result, Wilson does not know the identity of the CRM products sold by St. Jude or sold by Plaintiffs on behalf of St. Jude, Wilson does not know the identity of the cardiologists and electro-physiologist customers assigned to Plaintiffs, and Wilson never examined the

professional certifications of the sales personnel who took over responsibility for calling on some of Plaintiffs' accounts.

In conjunction with FRE 702, FRE 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Under Rule 703, the data used by an expert to form his opinion need not be admissible under the rules of evidence. *See* WEINSTEIN'S FED. EVID. 2D, § 703.03. However, if the data underlying the expert's opinion is "so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999). In other words, Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

The data which forms the basis for Wilson's projections are not reliable. Wilson should have independently verified the reliability of the data before opining on plaintiffs' future sales, as opposed to accepting it at the word of St. Jude's counsel. Therefore, the Court must exclude Wilson's testimony with regard to his projections. *See In re TMI*, 193 F.3d at 697-98 (upholding exclusion of expert testimony where sole basis for the testimony

-10-

was summaries prepared by party's attorney); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003) (underlying data was unreliable where expert did not base his opinion on primary data, did not know what the document was, who created it, or how it was created); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004) (where expert relied on summaries prepared by counsel and conducted little independent investigation, "to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable").

Aside from his projections, St. Jude argues that Wilson's opinions with regard to Gotter's opinions should still be admitted. The Court disagrees. These opinions are similarly tainted with the foundational concerns discussed above. For example, some of Gotter's projections are based on the Heinmiller projections, and Wilson opines that "Based on Lyman's deposition transcript, it would appear that [Lyman] was of the opinion that Heinmiller utilized the projections to sell him on the job at SJM. Lyman did not necessarily believe that he would be able to achieve the projections that were presented to him." Rebuttal Report at 8. However, Wilson never spoke with Heinmiller to verify this assumption, even though he perceived the need to do so. As a result, Wilson is in no better position to criticize Gotter's opinions than a lay person. Any probative value Wilson's opinions may have with regard to Gotter's opinions is outweighed by the danger of unfair prejudice and the possibility of misleading the jury. *See* Fed. R. Evid. 403.

For all of the foregoing reasons, Plaintiffs' motion to exclude Wilson's testimony and expert report is granted.

## II. Plaintiffs' remaining motions *in limine* [D. 150]

### A. Require St. Jude to produce certain witness for plaintiffs' case-in-chief

Plaintiffs intend to call adversely seven St. Jude witnesses in their case-in-chief. Three of these witnesses will not appear voluntarily: Heinmiller (CFO and Executive Vice President of St. Jude's parent company), James Lia ("Lia") (plaintiffs' former direct supervisor, now Regional Sales Director for St. Jude), and Joann Bartos ("Bartos") (succeeded Plaintiffs as sales representative). Plaintiffs served Heinmiller with a trial subpoena, which is subject to a motion to quash, discussed below. *See* Section III, H.

Plaintiffs argue that St. Jude must produce these witnesses for plaintiffs' case-in-chief because St. Jude intends to call them as part of its own case-in-chief. In the alternative, plaintiffs argue that St. Jude should be precluded from introducing live testimony from these witnesses if St. Jude refuses to produce them for plaintiffs' case-in-chief.

In response, St. Jude argues that the Court should adopt the "one-appearance" rule for Lia, Bartos, as well as additional witnesses[4] under FRE 611, which allows the Court to control the mode and order of interrogation and presentation of witnesses. For example, the parties have arrived at the following accommodation for Thomas O'Brien ("O'Brien")(VP of sales for southern part of the country): St. Jude will produce O'Brien at trial during St. Jude's case-in-chief for direct examination by St. Jude. Following this direct examination,

---

[4] These witnesses are: Richard Ames, Chris Kajfosz, Dr. Lanzarotti, and Dr. Niazi. (D. 178, St. Jude's response at 5).

counsel for plaintiffs may cross-examine O'Brien without being limited to matters covered in the direct examination.

With respect to some witnesses (excluding O'Brien), St. Jude takes the position that it be allowed to conduct its full direct examination during plaintiffs' case-in-chief, as opposed to a traditional cross-examination. Plaintiffs concede to this request and the Court adopts the one-appearance rule with respect to third-party witnesses Bartos, Kajfosz, Dr. Lanzarotti, and Dr. Niazi. These witnesses will be permitted to appear only once, when they are called during plaintiffs' case-in-chief, and St. Jude will be allowed to conduct its full direct examination at that time.

Plaintiffs do not concede to the one-appearance rule with respect to Ames, Lia, and Heinmiller. Ames is now a former employee of St. Jude who agreed to appear voluntarily on behalf of plaintiffs. The Court agrees that St. Jude should not be allowed to conduct a direct examination of Ames during plaintiffs' case-in-chief. St. Jude's request in this regard does not appear to be animated by judicial economy, as it actually has no way of compelling Ames' attendance during its own case-in-chief.

As for Lia, plaintiffs' concerns with respect to trial management and the presentation of its case carries the day. Lia is a key witness, and the scope of direct examination by St. Jude is likely to be time-consuming and to distract from the presentation of plaintiffs' case. Further, in arranging the order of its witnesses, plaintiffs budgeted for specific amounts of

-13-

time, which risks significant disruption if additional time is allotted for St. Jude's examination.[5]

Therefore, the Court adopts the one-appearance rule with respect to Bartos, Kajfosz, Dr. Lanzarotti, and Dr. Niazi. The mode and interrogation of these witnesses will proceed as discussed above. The Court will not adopt the one-appearance rule with respect to Ames and Lia.

### B. Preclude St. Jude from calling certain witnesses at trial

Plaintiffs move to preclude St. Jude from calling four witnesses who were not named in St. Jude's initial disclosures: Jeffrey Caprini, Dave Hendrick, Tracy Kopf, and Dan Reeder. None of these witnesses were deposed during discovery in this case. In addition, two of them (Reeder and Hendrick) were not identified in St. Jude's interrogatory responses.

Each party, "without awaiting a discovery request, [must] provide to the other parties . . . the name . . . of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses..." Fed. R. Civ. P. 26(a)(1)(A)(i). Parties are under a continuing duty to supplement these disclosures. *See* Fed. R. Civ. P. 26(e)(1).

If a party fails to make a proper disclosure, the party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

---

[5] St. Jude argues that Lia, who lives in Naperville, is outside of the Court's subpoena power because a map search indicates that the shortest driving route from Naperville to this courthouse is 103.1 miles. *See* Fed. R. Civ. P. 45(b)(2)(B) (subpoena may be served at any place outside the district but within 100 miles of the place specified for trial). St. Jude did not formally move to quash Lia's subpoena, but the argument is without merit, as the proper measurement is a straight line measurement, or "as the crow flies." *See Hill v. Equitable Bank, Nat. Ass'n*, 115 F.R.D. 184, 186 (D. Del. 1987). Using the GeoBytes "city distance tool," Naperville is 90 miles from Milwaukee. http://www.geobytes.com/citydistancetool.htm.

failure was substantially justified or was harmless." Fed. R. Civ. P. 37(c)(1). In exercising its discretion to exclude a witness, courts examine the following factors: (1) prejudice or surprise to the party's opponent; (2) whether the prejudice can be cured; (3) the likelihood of disruption; and (4) bad faith or willfulness in not complying. *See Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 2003).

While the names of Kopf and Caprini surfaced during the course of discovery, plaintiffs were never made aware of the subjects of their knowledge and whether they were likely to have discoverable information that might be used to support St. Jude's defenses, as required by the rule. Therefore, the failure to disclose was not harmless inasmuch as plaintiffs made a strategic decision not to depose these individuals. Nor was the failure with respect to any of these four witnesses substantially justified.

At this late stage, St. Jude's general averment that these witnesses will only provide "background information" that is largely irrelevant is unavailing, and also begs the question of why St. Jude would seek to introduce irrelevant testimony into an already lengthy trial. St. Jude fails to demonstrate how its lack of disclosure was substantially justified or harmless, and plaintiffs' motion to exclude these witnesses will be granted.

### C.    Exceed page limitation for testimony of Marc Sportsman

Marc Sportsman ("Sportsman") is a former Vice President of St. Jude, who now resides in Kansas City, Missouri. Sportsman was involved with the recruitment of Lyman to St. Jude. In anticipation of Sportsman's unavailability at trial (as he is a third party and

-15-

lives outside of the Court's subpoena range), the parties arranged to videotape Mr. Sportsman's deposition and designate the same as trial testimony.

Sportsman has material knowledge regarding Lyman's success in the CRM industry in Milwaukee; the negotiation of the Representative Agreement and Separate Letter Agreement; and Lyman's transition to sales representative for St. Jude. Sportsman will also testify regarding the negotiation of plaintiffs' salary guarantee and other aspects of the Representative Agreement, including St. Jude's assurances that it would hire a dedicated TSS (Technical Support Specialist) person to support plaintiffs' business with St. Jude.

Plaintiffs move to introduce 2 hours and 21 minutes of testimony from Sportsman's deposition.[6] This amounts to over 100 pages of the deposition transcript, but Civil L.R. 16.3(a)(6) provides that "[r]eading or playing more than 5 pages from a deposition will not be permitted unless the Court finds good cause." St. Jude objects to the introduction of 56 pages of the proposed testimony, arguing that this portion is either irrelevant or constitutes inadmissible hearsay.

For the reasons discussed below (Section III, A), Sportsman's testimony is not barred by the parol evidence rule. His testimony regarding pre-contract negotiations with plaintiffs is relevant to liability and damages. Therefore, the Court finds good cause for exceeding the page limit under Civil L.R. 16.3(a)(6). St. Jude's hearsay objection is overruled: the deposition testimony (D. 175, Exhibit A at 170:10) shows that Sportsman conclusively identified the document he was testifying about.

---

[6] The actual deposition lasted 7 hours.

-16-

### III.   St. Jude's remaining motions *in limine* [D. 137]

#### A.   Pre-contract negotiations and projections [St. Jude's Motion No. 2]

St. Jude moves for the exclusion of any evidence related to pre-contract negotiations, drafts, projections and other parol evidence, including the pre-contract sales projections jointly developed by Lyman and Heinmiller (the "Heinmiller projections"). St. Jude argues that such evidence is irrelevant in light of the Representative Agreement's "Merger and Integration" clause that nullifies any prior oral or written negotiations or agreements.

Parol evidence may not be used as evidence to modify or contradict the unambiguous terms of a written contract. *See Caulfield v. Caulfield*, 183 Wis. 2d 83, 92, 515 N.W.2d 278 (Ct. App. 1994). However, the parol evidence rule does not bar the introduction of such evidence for a different purpose. *See, e.g., Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis. 2d 593, 608 n.11, 407 N.W.2d 873 (1987) (refusing to apply the parol evidence rule and an integration clause when the extrinsic evidence was not offered to vary, contradict or even assist in the interpretation of a written document, but rather to show a separate element of a claim at issue); *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis. 2d 417, 426, 321 N.W.2d 293 (1982) ("The parol evidence rule only applies if the writing is intended by both parties to be the final and complete expression of their agreement and only bars evidence intended to vary such expression").

Plaintiffs will not seek to introduce any parol evidence in an attempt to modify or contradict the terms of the written contracts in this case. For example, the Heinmiller projections are being offered for purposes of proving plaintiffs' damages, as discussed above.

-17-

St. Jude cites *TAS Distributing Co., Inc. v. Cummins Engine Co.*, 491 F.3d 625, 636-37 (7th Cir. 2007), which held that evidence of pre-contractual projections during negotiations cannot be considered proof of damages and is barred by the parol evidence rule. However, in the instant case, the Heinmiller projections supplement the expectations of the parties in the Representative Agreement (and Separate Letter Agreement), wherein the parties expressly agreed on the payment of future sales commissions based on the volume of sales. The Heinmiller projections do not, as in *TAS*, contradict the written terms of the contract. *See TAS*, 491 F.3d at 637.[7]

As for other evidence of pre-contract negotiations, including evidence demonstrating why Lyman left his highly lucrative position at Guidant, as well as the value of the terms of the contract (including the put option), none of this evidence is being offered to vary or contradict the written contracts. Rather, such evidence is relevant to the factual issues in the case regarding liability and damages.

Therefore, St. Jude's motion to exclude pre-contract negotiations and projections will be denied.

### B.    St. Jude financial information [No. 3]

St. Jude moves to exclude the introduction of any evidence, argument or reference to the financial condition, net worth, revenues, or profits of St. Jude or its parent company, St. Jude Medical, Inc..  St. Jude argues that this evidence is inadmissible under FRE 403 as

---

[7]As noted by the court in *TAS*, "Had TAS and Cummins intended the minimum royalty payments to set a minimum sales floor but in fact meant to require Cummins to pay significantly more than the amount outlined in the minimum royalty payment schedule, they were obligated, under Illinois law, to include this understanding within the four corners of the contract."  491 F.3d at 637.

unfairly prejudicial because it may give the jury the false impression that a verdict would have little effect on the corporation's bottom line. Evidence of St. Jude's financial condition is relevant to the projection of plaintiffs' sales over the course of his Representative Agreement with St. Jude. Any potential prejudice can be cured through an appropriate limiting instruction. St. Jude's motion to exclude evidence regarding its financial condition will be denied.

### C. Motive or intent for claimed breach of contract [No. 4]

St. Jude moves to exclude the introduction of any evidence, argument or reference related to St. Jude's unstated intent or motive for terminating the Representative Agreement. St. Jude argues that motive is irrelevant to a claim for breach of contract. St. Jude also argues that any probative value is outweighed by the potential prejudice if the Court allows evidence of St. Jude's motive to be presented at trial.

The Court understands the general proposition that if a party "has a legal right to terminate the contract . . . its motive for exercising that right is irrelevant." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000). St. Jude takes that simple rule and distorts it into a rather confusing motion which apparently anticipates a wide range of hypothetical, unstated evidence that plaintiffs might introduce at trial. The Court is in no position to hold, *in limine*, that *any* evidence somehow related to "motive" or "pretext" would be irrelevant to the claims and defenses in the instant case, especially when it has no idea what that evidence might be. In a general sense, such

-19-

evidence could be relevant in the jury's determination of *whether* (or not) St. Jude terminated Lyman/plaintiffs for cause.

Moreover, St. Jude fails to meet its burden under FRE 403 that the probative value of such evidence is outweighed by the danger of unfair prejudice or of misleading the jury. Therefore, St. Jude's motion to exclude all evidence of motive or intent will be denied.

### D. Evidence of class action lawsuit [No. 5]

St. Jude's parent company, St. Jude Medical, Inc., is the target of a class action securities lawsuit currently pending in Minnesota federal district court. The lawsuit generally alleges that St. Jude Medical engaged in "channel stuffing," whereby it sold large quantities of CRM products through bulk sales in excess of a hospitals' needs, thereby boosting the current financial reporting period. St. Jude argues that any pleadings from that case, including a subpoena issued by the U.S. Department of Justice, should be excluded as inadmissible hearsay. St. Jude also argues that any reference to the class action suit should be barred as unduly prejudicial under FRE 403.

First, St. Jude argues that the class action pleadings are inadmissible hearsay, and the pleadings will be offered for purposes of proving the truth of the matters asserted therein. *See* Fed. R. Evid. 801(c). Plaintiffs intend to use the pleadings in its cross-examination of Heinmiller, who is a named defendant in the class action suit. If the pleadings are offered for an impermissible hearsay purpose, St. Jude will have the opportunity to object at that particular time.

-20-

Second, evidence of the class action lawsuit is relevant to plaintiffs' liability claims and to damages. One of the proffered justifications for St. Jude's termination of Lyman was his conduct with respect to a bulk sale that occurred at St. Luke's Medical Center. Therefore, the fact and allegations of the class action lawsuit are relevant to determining whether St. Jude terminated plaintiffs for cause under the contract or for some other impermissible purpose.[8] Also, in projecting sales (and damages), plaintiffs argue that St. Jude unreasonably interfered with their ability to maximize sales with St. Jude, and St. Jude's conduct with respect to bulk sales is one of the ways that plaintiffs allege interference. Even though the class action complaint alleges that St. Jude Medical, Inc. engaged in channel stuffing in 2005 and 2006, and plaintiffs were selling products for St. Jude in 2003-2004, at a minimum the class action lawsuit corroborates plaintiffs' theories about bulk sales in 2003-2004.[9]

Finally, the probative value of evidence regarding the class action lawsuit is not substantially outweighed by the danger of unfair prejudice under FRE 403. Any danger that the jury will accept the allegations of the class action lawsuit and assume that St. Jude is a "bad actor" can be alleviated by a properly-worded limiting instruction.

### E. Evidence of attorney fees [No. 6]

The Representative Agreement contains an attorney fee-shifting clause. St. Jude moves to exclude the introduction of any evidence or argument as to the amount or

---

[8] St. Jude argues that this goes to motive and intent, which is irrelevant as argued in one of St. Jude's motions *in limine* (#4). As discussed above, this argument is without merit. In this context, evidence with regard to St. Jude's motivation for terminating the contract are separate from whether St. Jude actually terminated the contract "for cause."

[9] Magistrate Judge Noel granted a motion to compel the production of documents by St. Jude Medical dating back to October 2004.

reasonableness of the attorney fees and court costs incurred by any party in this litigation. Plaintiffs do not oppose this motion, which is granted. This issue presents a question of law for the Court after a verdict is rendered by the jury. *See Huff v. Dobbins, Fraker, Tennant, Joy & Perlstein*, 243 F.3d 1086, 1090 (7th Cir. 2001) ("attorney's fees are a matter for the court, not the jury"); *Cintas Corp. v. Perry*, 517 F.3d 459, 470 (7th Cir. 2008) ("district court is in a superior position to observe the work of the attorneys . . . and appraise the appropriate value of their services").

### F.   Choice of law [No. 7]

The Representative Agreement contains a choice of law provision directing the application of Minnesota law. St. Jude moves for the application of Wisconsin law, unless the parties demonstrate a conflict or meaningful difference with Minnesota law. Plaintiffs do not oppose this motion, which is granted. *See Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 1002 (E.D. Wis. 1999) (if there is no "outcome determinative" conflict, the "law of the forum applies"); *Kochert v. Adagen Medical Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007) (ignoring choice of law clause where parties identified no conflict between states' laws).

### G.   Good faith and fair dealing [No. 8]

Plaintiffs allege and will attempt to prove at trial that St. Jude breached the express terms of the Representative Agreement, as well as the implied covenant of good faith and fair dealing. Every contract includes an implied covenant of good faith and fair dealing, whereby a party under a contract may not unjustifiably hinder the other party's performance under the contract. *See, e.g., In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494,

-22-

502-03 (Minn. 1995); *Metro Ventures, LLC v. GEA Assocs.*, 291 Wis. 2d 393, 414-15 (2006).

St. Jude moves to exclude at trial any argument that St. Jude's breaches of the express terms of the written contract also constituted a breach of the implied covenant of good faith and fair dealing. St. Jude argues that the law does not support this "double-dipping" argument based on the same conduct. "Minnesota law does not recognize a separate claim for breach of the duty of good faith . . . when it arises from the same conduct incorporated in claims for breach of express terms in the contract." *Seren Innovations, Inc. v. Transcontinental Ins. Co.*, No. A05-917, 2006 WL 1390262 at *8 (Minn. Ct. App. 2006) (unpublished) (citing *Wild v. Rarig*, 234 N.W.2d 775, 790 (Minn. 1975)).

Plaintiffs intend to introduce evidence that St. Jude breached many of the express terms of the contract, as well as evidence that St. Jude engaged in additional intentional conduct that interfered with plaintiffs' performance under the Agreement. Therefore, plaintiffs' claim for breach of the implied covenant is actually separate from the claims under the express terms of the contract. Further, the entire course of conduct cannot be so easily separated. While the claims themselves are separate, there should be nothing to prevent a jury from concluding that an express breach merely provides further evidence that a party intentionally interfered and breached the implied covenant of good faith and fair dealing. St. Jude's motion to exclude argument that breaches of the express terms of the contract also constitute a breach of the implied covenant of good faith and fair dealing will be denied.

-23-

### H.     Quash Trial Subpoena for John Heinmiller [D. 171]

Plaintiffs served John Heinmiller with a trial subpoena at his place of work in St. Paul, Minnesota.  St. Jude moves to quash Heinmiller's subpoena on the grounds that it was served outside of this judicial district and outside of 100-miles from this courthouse.  *See* Fed. R. Civ. P. 45(b)(2)(A), (B).

Fed. R. Civ. P. 45(b)(2)(B) provides that "*Subject to* Rule 45(c)(3)(A)(ii), a subpoena may be served at any place...outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection." (emphasis added).  In turn, Fed. R. Civ. 45(c)(3)(A)(ii) provides that on timely motion, the issuing court "must quash or modify a subpoena that . . . requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person . . ."

The majority of courts interpret these provisions together to mean a that a court may compel the trial testimony of a party or a party's officer even when the person to be compelled resides beyond the 100-mile range for subpoenas.  *See Venzor v. Chavez Gonzalez*, 968 F. Supp. 1258, 1267 (N.D. Ill. 1997); *Am. Fed'n of Gov't Employees Local 922 v. Ashcroft*, 354 F. Supp. 2d 909, 915-16 (E.D. Ark. 2003); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 587 (D. Minn. 1999); *In re Vioxx Prods. Liab. Litig.*, 438 F. Supp. 2d 664, 666-67 (E.D. La. 2006).   As noted by the court in *Vioxx*, the "person who is not a party or an officer of a party" language of Rule 45(c)(3)(A)(ii) "supports the inverse inference that Rule 45(b)(2) empowers the Court with the authority to

subpoena . . . an officer of a party, to attend a trial beyond the 100 mile limit."  438 F. Supp. 2d at 667.

However, the Court disagrees with this interpretation of the provisions of Rule 45. Rule 45(b)(2) sets forth certain requirements for a subpoena to be properly served and to have the force to compel attendance.  Rule 45(c)(3)(A)(ii) provides specific circumstances under which a court must quash a subpoena, "but it does not alter the requirements for proper service of a subpoena." *Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, — F. Supp. 2d —, 2008 WL 1977507 at *5 (E.D. La.).  Therefore, to compel attendance at trial, the person "must be served with a subpoena in one of the places listed in Rule 45(b)(2) *and* not be subject to the protection in Rule 45(c)(3)(A)(ii), which protects nonparty witnesses who work or reside more than 100 miles from the courthouse, but not parties or party officers." *Id.* at *6 (emphasis in original).

The Court agrees with the reasoning in *Big Lots Stores* and the other courts that adhere to the purported minority interpretation of the interplay between Rule 45(b)(2) and Rule 45(c)(3)(A)(ii).  As one court noted, the majority position makes a "jump" that "may not logically follow from the text of the Rule."  *Mazloum v. District of Columbia Metropolitan Police Dep't*, No. 06-0002 (JDB), — F.R.D. —, 2008 WL 1028352 at *3-4 (D.D.C.).  "There is simply no 'negative implication' . . . that Rule 45(c)(3)(A)(ii) subjects to subpoena officers of parties who are more than 100 miles from the place of trial whether or not they are within the range of the subpoena power defined in Rule 45(b)(2)." *Johnson v. Land O'Lakes, Inc.*, 181 F.R.D. 388, 397 (N.D. Iowa 1998).

-25-

Ultimately, the "upshot of Rule 45(c)(3)(A)(ii) with respect to *party* witnesses is . . . that a court is not *required* to quash a *properly* served subpoena even if it required a party witness to travel more than 100 miles." *Id.* at *4 (emphasis in original); *see also Jamsports and Entertainment, LLC v. Paradama Prods., Inc.*, No. 02 C 2298, 2005 WL 14917 (N.D. Ill.) ("Read in context, the cross-reference of Rule 45(c)(3)(A)(ii) in Rule 45(b)(2) is meant to reflect that even if service of a subpoena is otherwise proper under Rule 45(b)(2), the subpoena is to be quashed if it imposes a requirement identified in Rule 45(c)(3)(A)(ii)").

Therefore, because service of the Heinmiller trial subpoena did not comply with any of the requirements of Rule 45(b)(2), it must be quashed. The Court appreciates the importance of Heinmiller's adverse testimony to plaintiffs' case-in-chief. However, Fed. R. Civ. P. 32(a)(4)(D) allows the introduction of videotaped deposition testimony when the attendance of a witness cannot be obtained by subpoena. *See Big Lots Stores*, 2008 WL 1977507 at *7 ("It is true that a witness's live testimony is often preferable to the presentation of deposition testimony. But the Federal Rules anticipate the unavailability of a witness and provide mechanisms to ensure that a party can first gather that witness's testimony and then present it at trial").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.      St. Jude's motion to exclude certain expert opinions of Plaintiffs' expert Daniel Gotter [D. 124] is **DENIED**;

2.      Plaintiffs' motion to exclude the expert testimony and report of St. Jude's expert Randall D. Wilson [D. 120] is **GRANTED**;

3.      Plaintiffs' motion to require St. Jude to produce certain witnesses for plaintiffs' case-in-chief [D. 150] is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion (see Section II, A);

4.      Plaintiffs' motion to preclude St. Jude from calling certain witnesses to testify at trial [D. 150] is **GRANTED**;

5.      Plaintiffs' motion to exceed the page limitation for the testimony of Marc Sportsman [D. 150] is **GRANTED**;

6.      St. Jude's motion for an order excluding any evidence or argument related to pre-contract negotiations, drafts, projections, and other parol evidence [D. 137] is **DENIED**;

7.      St. Jude's motion to exclude any evidence, argument or reference at trial related to the financial condition, net worth, profits or revenues of St. Jude or its parent company St. Jude Medical, Inc. [D. 137] is **DENIED**;

8.      St. Jude's motion to exclude any evidence, argument or reference at trial related to St. Jude's unstated intent or motive for terminating the Representative Agreement and other claims breaches of contract [D. 137] is **DENIED**;

9.     St. Jude's motion to exclude any evidence, argument or reference at trial related to the pending class action lawsuit *In re St. Jude Medical, Inc. Securities Litigation* [D. 137] is **DENIED**;

10.     St. Jude's motion to exclude any evidence or argument at trial as to the amount or reasonableness of the attorneys' fees and courts costs incurred by any party in this action [D. 137] is **GRANTED**;

11.     St. Jude's motion to apply Wisconsin law to all substantive issues, unless a meaningful conflict exists between Wisconsin and Minnesota law [D. 137] is **GRANTED**;

12.     St. Jude's motion to exclude any argument at trial that St. Jude's alleged breaches of the express terms in the written contract also constituted a breach of the implied covenant of good faith and fair dealing [D. 137] is **DENIED**;

13.      St. Jude's motion to quash the trial subpoena of John Heinmiller [D. 171] is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 27th day of May, 2008.

**SO ORDERED,**

 **s/ Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**

-28-